COLORADO HIGH SCHOOL ACTIVITIES ASSOCIATION, an unincorporated association; Boulder Valley School District No. RE–2, a body corporate; and Jefferson County School District No. R–1, a body corporate, Plaintiffs-Appellants,

v.

NATIONAL FOOTBALL LEAGUE, an unincorporated association; Pete Rozelle, in his official capacity as Commissioner of the National Football League; CBS Inc., a corporation; National Broadcasting Company, Inc., a corporation; McGraw-Hill Broadcasting Company, Inc., a corporation; and General Electric Broadcasting Company of Colorado, Inc., a corporation, Defendants-Appellees.

No. 81–2278.

United States Court of Appeals, Tenth Circuit.

July 5, 1983.

Gerald A. Caplan, Boulder, Colo. (Alexander Halpern, Boulder, Colo., with him on the brief) of Caplan & Earnest, Boulder, Colo., for plaintiffs-appellants.

Gordon G. Greiner, Denver, Colo. (Peter C. Houtsma, with him on brief) of Holland & Hart, Denver, Colo., for CBS Inc. and McGraw Hill-Broadcasting Co., Inc., for defendants-appellees.

Jeffrey H. Howard and Donald E. Phillipson of Davis, Graham & Stubbs, Washington, D.C., filed a brief for defendants-appellees Nat. Football League and Pete Rozelle.

James C. Ruh of Ireland, Stapleton & Pryor, P.C., Denver, Colo., and H. Richard Schumacher of Cahill Gordon & Reindell, New York City, filed a brief for defendant-appellee Nat. Broadcasting Co., Inc.

Before SETH, Chief Judge, SEYMOUR and TIMBERS,* Circuit Judges.

SEYMOUR, Circuit Judge.

Plaintiffs Colorado High School Activities Association, Boulder Valley School District No. RE–2, and Jefferson County School District No. R–1 (hereinafter collectively referred to as CHSAA) brought this action alleging that defendants' television broadcasts of particular professional football games in 1977, 1978, and 1979 were antitrust violations under section 2 of the Sherman Act, 15 U.S.C. § 2 (1976), and the Colorado Restraint of Trade and Commerce Act, Colo.Rev.Stat. § 6–4–101 et seq. (1973). Defendants are the National Football League, Commissioner Pete Rozelle, CBS, National Broadcasting Company, McGraw-Hill Broadcasting Company, and General Electric Broadcasting Company of Colorado (hereinafter collectively referred to as the NFL). The district court granted the NFL's motion for summary judgment, concluding that CHSAA had failed to state a claim under the federal statute. *Colorado High School Activities Association v. National Football League*, 524 F.Supp. 60, 63 (D.Colo.1981). We affirm.

The disposition of this case requires us to construe a term found in a statutory limitation to the antitrust exemption for joint professional football television broadcast agreements.[1] The antitrust exemption, 15 U.S.C. § 1291 (1976),[2] enables the member clubs of a professional football league "to pool their separate rights in the sponsored telecasting of their games and to permit the league to sell the resulting package of pooled rights to a purchaser, such as a television network, without violating the antitrust laws." S.Rep. No. 1087, 87th Cong., 1st sess., *reprinted in* 1961 U.S.Code Cong. & Ad.News 3042, 3042. However, this exemption is limited by 15 U.S.C. § 1293 (1976), which was enacted to prevent such package contracts from impairing "college football gate receipts through network telecasts of professional football games at times when college games are normally played." *Id.* The limitation in section 1293 was extended to cover interscholastic high school football games in 1966. Section 1293 provides in relevant part:

"The first sentence of section 1291 of this title shall not apply to any joint agreement described in such section which permits the telecasting of all or a substantial part of any professional football game on any Friday after six o'clock postmeridian or on any Saturday during the period beginning on the second Friday in September and ending on the second Saturday in December in any year from any telecasting station located within seventy-five miles of the *game site* of any intercollegiate or interscholastic football contest scheduled to be played on such a date if—

.   .   .   .   .

---

* Honorable William H. Timbers, Senior Judge, United States Court of Appeals for the Second Circuit, sitting by designation.

1. For a general discussion of the events culminating in the enactment of this legislation, see *WTWV, Inc. v. National Football League*, 678 F.2d 142, 144 (11th Cir.1982).

2. Section 1291 provides:
   "The antitrust laws, as defined in section 1 of the Act of October 15, 1914, as amended (38 Stat. 730) [15 U.S.C. 12], or in the Federal Trade Commission Act, as amended (38 Stat. 717) [15 U.S.C. 41 et seq.], shall not apply to any joint agreement by or among persons engaging in or conducting the organized professional team sports of football, baseball, basketball, or hockey, by which any league of clubs participating in professional football, baseball, basketball, or hockey contests sells or otherwise transfers all or any part of the rights of such league's member clubs in the sponsored telecasting of the games of football, baseball, basketball, or hockey, as the case may be, engaged in or conducted by such clubs. In addition, such laws shall not apply to a joint agreement by which the member clubs of two or more professional football leagues, which are exempt from income tax under section 501(c)(6) of the Internal Revenue Code of 1954 [26 U.S.C. 501(c)(6)], combine their operations in expanded single league so exempt from income tax, if such agreement increases rather than decreases the number of professional football clubs so operating, and the provisions of which are directly relevant thereto."
   15 U.S.C. § 1291 (1976).

(2) in the case of an interscholastic football contest, such contest is between secondary schools, both of which are accredited or certified under the laws of the State or States in which they are situated and offer courses continuing through the twelfth grade of the standard school curriculum, or the equivalent, and

(3) such intercollegiate or interscholastic football contest and such *game site* were announced through publication in a newspaper of general circulation prior to August 1 of such year as being regularly scheduled for such day and place."

15 U.S.C. § 1293 (emphasis added). At issue in this case is the construction of the term "game site" as used in this statute.

In 1977, CHSAA attempted to comply with the requirements of section 1293(3) by timely publishing an announcement that the Colorado state 4A football championship would be played "in Denver" on the second Saturday in December. In fact, the game was played in Boulder. In 1978 and 1979, CHSAA announced that the "game site" would be "in the Denver metropolitan area." The 1978 game was held in Boulder and the 1979 game in Lakewood, both on the second Saturday in December. Professional football games were telecast in the Denver area on all three Saturdays.

CHSAA contends that it identified the game site with sufficient specificity to invoke the limitation provided in section 1293, and that the broadcasts of the professional football games were therefore not exempt from the antitrust laws under section 1291. It points out that the championship games have traditionally been played on the home field of one of the finalists. Under the CHSAA playoff system, the championship finalists are not known until shortly before the final game is to be played. Thus CHSAA argues that it gave the best game site designation possible by August 1 of the relevant years. It vigorously asserts that a statutory construction requiring a more specific game site identification than CHSAA is able to give would frustrate the Congressional purpose of protecting high school football gate receipts.

Defendants contend that the plain meaning of "game site" is the particular location where the game is to be played. They argue that this meaning is required by the function that "game site" plays in the statutory scheme, and that there is no legislative history supporting a contrary construction. The district court agreed, holding that "the term 'game site' is as plain, common and clear as the term 'construction site' in a mechanics lien case or 'work site' in a labor dispute." 524 F.Supp. at 62.

This is a case of first impression. Resolution of the issue is governed by well-established principles of statutory construction. "In determining the scope of a statute, we look first to its language. If the statutory language is unambiguous, in the absence of 'a clearly expressed legislative intent to the contrary, that language must ordinarily be regarded as conclusive.'" *United States v. Turkette,* 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981) (quoting *Consumer Product Safety Commission v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980)). "A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." *Perrin v. United States,* 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1979).

"Site" is defined as "the scene of an action ... or specified activity," *Webster's Third New International Dictionary* 2129 (1976), or "the area or plot of ground on which anything has been or is to be located." *The Random House College Dictionary* 1230 (rev. ed. 1980). Therefore, the common sense, unambiguous meaning of "game site" is that particular football field or stadium where the game is to be played. This construction fulfills the function which "game site" is to perform in the statutory scheme, i.e., to provide a specific, fixed point from which to establish the 75-mile blackout radius.

We find no clearly expressed legislative intent contrary to this plain meaning. Indeed, the legislative history does not address the issue, presumably because Con-

gress did not consider the peculiar facts now before us. We note that " '[t]he plain words and meaning of a statute cannot be overcome by a legislative history which, through strained processes of deduction from events of wholly ambiguous significance, may furnish dubious bases for inference in every direction.' " *Ex Parte Collett,* 337 U.S. 55, 61, 69 S.Ct. 944, 947, 93 L.Ed. 1207 (1949) (quoting *Gemsco, Inc. v. Walling,* 324 U.S. 244, 260, 65 S.Ct. 605, 614, 89 L.Ed. 921 (1945)); *see TVA v. Hill,* 437 U.S. 153, 184 n. 29, 98 S.Ct. 2279, 2296, n. 29, 57 L.Ed.2d 117 (1978).

In sum, we are not inclined to ignore the plain meaning of the statute and readjust the balance of competing interests struck by Congress. *See, e.g., TVA v. Hill,* 437 U.S. at 194–95, 98 S.Ct. at 2301–2302. The judgment is affirmed.