*33 Justice Souter
delivered the opinion of the Court.
For some time, the law has provided that an order for removing an alien present unlawfully may be reinstated if he leaves and unlawfully enters again. The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub. L. 104-208, div. C, 110 Stat. 3009-546, enlarged the class of illegal reentrants whose orders may be reinstated and limited the possible relief from a removal order available to them. See Immigration and Nationality Act (INA), § 241(a)(5), 66 Stat. 204, as added by IIRIRA § 305(a)(3), 110 Stat. 3009-599, 8 U. S. C. § 1231(a)(5). The questions here are whether the new version of the reinstatement provision is correctly read to apply to individuals who reentered the United States before IIRIRA’s effective date, and whether such a reading may'be rejected as impermissibly retroactive. We hold the statute applies to those who entered before IIRIRA and does not retroactively affect any right of, or impose any burden on, the continuing violator of the INA now before us.
I
In 1950, Congress provided that deportation orders issued against some aliens who later reentered the United States illegally could be reinstated.[1] Internal Security Act of 1950, § 23(d), 64 Stat. 1012, 8 U. S. C. § 156(d) (1946 ed., Supp. V).[2] Only specific illegal reentrants were subject to the provision, *34 those deported as “anarchists” or “subversives,” for example, see § 23(c), 64 Stat. 1012, while the rest got the benefit of the ordinary deportation rules. Congress retained a reinstatement provision two years later when it revised the immigration laws through the INA, § 242(f), 66 Stat. 212, as codified in this subsection:
“Should the Attorney General find that any alien has unlawfully reentered the United States after having previously departed or been deported pursuant to an order of deportation, whether before or after June 27, 1952,[3] on any ground described ... in subsection (e) . . . , the previous order of deportation shall be deemed to be reinstated from its original date and such alien shall be deported under such previous order at any time subsequent to such reentry.” 8 U. S. C. § 1252(f) (1994 ed.).
Again, only a limited class of illegal reentrants was susceptible, see § 242(e), 66 Stat. 211; cf. § 241(a), id., at 204, and even those affected could seek some varieties of discretionary relief, see, e. g., 8 U. S. C. § 1254(a)(1) (1994 ed.) (suspension of deportation available to aliens who maintained a continuous presence in the United States for seven years and could demonstrate extreme hardship and a good moral character).
In IIRIRA, Congress replaced this reinstatement provision with one that toed a harder line, as the old § 242(f) was displaced by the new § 241(a)(5):
“If the Attorney General finds that an alien has reentered the United States illegally after having been removed or having departed voluntarily, under an order of removal, the prior order of removal is reinstated from its original date and is not subject to being reopened or reviewed, the alien is not eligible and may not apply *35 for any relief under this chapter, and the alien shall be removed under the prior order at any time after the reentry.” 8 U. S. C. § 1231(a)(5) (1994 ed., Supp. III).
The new law became effective on April 1, 1997, “the first day of the first month beginning more than 180 days after” IIRIRA’s enactment. § 309(a), 110 Stat. 3009-625. Unlike its predecessor, § 241(a)(5) applies to all illegal reentrants, explicitly insulates the removal orders from review, and generally forecloses discretionary relief from the terms of the reinstated order.[4]
II
Humberto Fernandez-Vargas is a citizen of Mexico, who first came to the United States in the 1970s, only to be deported for immigration violations, and to reenter, several times, his last illegal return having been in 1982. Then his luck changed, and for over 20 years he remained undetected in Utah, where he started a trucking business and, in 1989, fathered a son, who is a United States citizen. In 2001, Fernandez-Vargas married the boy’s mother, who is also a United States citizen. She soon filed a relative-visa petition on behalf of her husband, see 8 U. S. C. §§ 1154(a), 1151(b) (2000 ed.); see Fernandez-Vargas v. Ashcroft, 394 F. 3d 881, 883, n. 4 (CA10 2005), on the basis of which he filed an application to adjust his status to that of lawful permanent resident, see § 1255(f). The filings apparently tipped off the authorities to his illegal presence here, and in November 2003, the Government began proceedings under § 241(a)(5) that eventuated in reinstating Fernandez-Vargas’s 1981 deporta *36 tion order, but without the possibility of adjusting his status to lawful residence. He was detained for 10 months before being removed to Juarez, Mexico, in September 2004.
Fernandez-Vargas petitioned the United States Court of Appeals for the Tenth Circuit to review the reinstatement order. He took the position that because he illegally reentered the country before IIRIRA’s effective date, the controlling reinstatement provision was the old § 242(f), which meant he was eligible to apply for adjustment of status as spouse of a citizen, and he said that the new § 241(a)(5) would be impermissibly retroactive if it barred his application for adjustment. The Court of Appeals held that § 241(a)(5) did bar Fernandez-Vargas’s application and followed Landgraf v. USI Film Products, 511 U. S. 244 (1994), in determining that the new law had no impermissibly retroactive effect in Fernandez-Vargas’s case. 394 F. 3d, at 886, 890-891. We granted certiorari to resolve a split among the Courts of Appeals over the application of § 241(a)(5) to an alien who reentered illegally before IIRIRA’s effective date,[5] 546 U. S. 975 (2005), and we now affirm.
*37 III
Statutes are disfavored as retroactive when their application “would impair rights a party possessed when he acted, increase a party’s liability for past conduct, or impose new duties with respect to transactions already completed.” Landgraf, supra, at 280. The modern law thus follows Justice Story’s definition of a retroactive statute, as “tak[ing] away or impairing] vested rights acquired under existing laws, or creating] a new obligation, imposing] a new duty, or attaching] a new disability, in respect to transactions or considerations already past,” Society for the Propagation of the Gospel v. Wheeler, 22 F. Cas. 756, 767 (No. 13,156) (CCNH 1814). Accordingly, it has become “a rule of general application” that “a statute shall not be given retroactive effect unless such construction is required by explicit language or by necessary implication.” United States v. St. Louis, S. F. & T. R. Co., 270 U. S. 1, 3 (1926) (opinion for the Court by Brandéis, J.).
This Court has worked out a sequence of analysis when an objection is made to applying a particular statute said to affect a vested right or to impose some burden on the basis of an act or event preceding the statute’s enactment. We first look to “whether Congress has expressly prescribed the statute’s proper reach,” Landgraf, supra, at 280, and in the absence of language as helpful as that we try to draw a comparably firm conclusion about the temporal reach specifically intended by applying “our normal rules of construction,” Lindh v. Murphy, 521 U. S. 320, 326 (1997). If that effort fails, we ask whether applying the statute to the person objecting would have a retroactive consequence in the disfavored sense of “affecting substantive rights, liabilities, or duties [on the basis of] conduct arising before [its] enactment,” Landgraf, supra, at 278; see also Lindh, supra, at 326. If the answer is yes, we then apply the presumption against retroactivity by construing the statute as inapplicable to the *38 event or act in question owing to the “absentee of] a clear indication from Congress that it intended such a result.” INS v. St. Cyr, 533 U. S. 289, 316 (2001); see Martin v. Hadix, 527 U. S. 343, 352 (1999) (quoting Landgraf, supra, at 280).
Fernandez-Vargas fights at each step of the way, arguing that Congress intended that INA § 241(a)(5) would not apply to illegal reentrants like him who returned to this country before the provision’s effective date; and in any event, that application of the provision to such illegal reentrants would have an impermissibly retroactive effect, to be avoided by applying the presumption against it. We are not persuaded by either contention.[6]
A
Needless to say, Congress did not complement the new version of § 241(a)(5) with any clause expressly dealing with individuals who illegally reentered the country before IIRIRA’s April 1, 1997, effective date, either including them within §241(a)(5)’s ambit or excluding them from it. Fernandez-Vargas argues instead on the basis of the generally available interpretive rule of negative implication, when he draws attention to language governing temporal reach contained in the old reinstatement provision, but missing from the current one. Section 242(f) applied to “any alien [who] has unlawfully reentered the United States after having previously departed or been deported pursuant to an *39 order of deportation, whether before or after June 27, 1952, on any ground described in . . . subsection (e).” 8 U. S. C. § 1252(f) (1994 ed.). According to Fernandez-Vargas, since that before-or-after clause made it clear that the statute applied to aliens who reentered before the enactment date of the earlier version, its elimination in the current iteration shows that Congress no longer meant to cover preenactment reentrants. See Brewster v. Gage, 280 U. S. 327, 337 (1930) (“deliberate selection of language . . . differing from that used in the earlier Acts” can indicate “that a change of law was intended”); cf. 2B N. Singer, Statutes and Statutory Construction §51.04, p. 244 (6th rev. ed. 2000). But the clues are not that simple.
To begin with, the old before-or-after clause was sandwiched between references to departure or deportation under a deportation order and to grounds for deportation set out in a different subsection of the INA. It thus most naturally referred not to the illegal reentry but to the alien’s previous deportation or departure. If its omission from the new subsection (a)(5) is significant, its immediate significance goes to the date of leaving this country, not the date of illegal return. Since the old clause referred to the date of enactment of the INA in 1952, the negative implication argument from dropping the language is that the reinstatement section no longer applies to those who left the country before that date. But, in 1996, application keyed to departures in 1952 or earlier was academic, and the better inference is that the clause was removed for that reason.[7]
If, moreover, we indulged any suggestion that omitting the clause showed an intent to apply § 241(a)(5) only to deportations or departures after IIRIRA’s effective date, the result would be a very strange one: it would exempt from the new *40 reinstatement provision’s coverage anyone who departed before IIRIRA’s effective date but reentered after it. The point of the statute’s revision, however, was obviously to expand the scope of the reinstatement authority and invest it with something closer to finality, and it would make no sense to infer that Congress meant to except the broad class of persons who had departed before the time of enactment but who might return illegally at some point in the future.
Fernandez-Vargas sidesteps this problem (on a very generous reading of his argument) by making a more general sug- • gestión of congressional intent: whatever the event to which the old law was tied, activity before as well as activity after it implicated the reinstatement power. Since the new law is bereft of such clarity, we should apply the “ ‘longstanding principle of construing any lingering ambiguities in deportation statutes in favor of the alien,’” St. Cyr, supra, at 320 (quoting INS v. Cardoza-Fonseca, 480 U. S. 421, 449 (1987)), which would effectively impose “[t]he presumption against retroactive application of ambiguous statutory provisions,” St. Cyr, supra, at 320. If we did so, we would find that § 241(a)(5) operates only to reentries after its effective date.
Even at this amorphously general level, however, the argument suffers from two flaws, the first being that it puts the cart before the horse. As Fernandez-Vargas realizes, he urges application of the presumption against retroactivity as a tool for interpreting the statute at the first Landgraf step. But if that were legitimate, a statute lacking an express provision about temporal reach would never be construed as having a retroactive potential and the final two steps in the Landgraf enquiry would never occur (that is, asking whether the statute would produce a retroactive effect, and barring any such application by applying the presumption against retroactivity). It is not until a statute is shown to have no firm provision about temporal reach but to produce a retroactive effect when straightforwardly applied that the presumption has its work to do. See 511 U. S., at 280.
*41 The second flaw is the argument’s failure to account for the new statute’s other provisions on temporal reach, from which one might draw a negative inference that subsection (a)(5) was (or at least may well have been) meant to apply to reentries before its effective date. In contrast to their silence about the temporal sweep of § 241(a)(5), the 1996 amendments speak directly to the scope of changes in provisions making reentry criminal and setting civil penalties. IIRIRA § 324(c), 110 Stat. 3009-629, note following 8 U. S. C. § 1326 (2000 ed.), provides that the expanded criminal prohibitions, see § 1326(a), apply only to reentries or attempts after the effective date, and § 105(b), 110 Stat. 3009-556, note following 8 U. S. C. § 1325, provides the same as to civil penalties for illegal reentry, see § 1325(b). The point here is not that these provisions alone would support an inference of intent to apply the reinstatement provision retroactively, see Lindh, 521 U. S., at 328, n. 4, for we require a clear statement for that, see Martin, 527 U. S., at 354. But these provisions do blunt any argument that removal of the before-or-after clause suffices to establish the applicability of § 241(a)(5) only to posteffective date reentries. The fact is that IIRIRA sometimes expressly made changes prospective as from its effective date and sometimes expressly provided they were applicable to earlier acts; compare §§ 324(c) and 105(b) with § 347(c), 110 Stat. 3009-639 (provision governing removal of aliens who have unlawfully voted is applicable “to voting occurring before, on, or after the date of the enactment of this Act”), and § 351(c), id., at 3009-640 (provision applicable to “waivers filed before, on, or after the date of the enactment of this Act”). With such a variety of treatment, it is just too hard to infer any clear intention at any level of generality from the fact of retiring the old before-or-after language from what is now § 241(a)(5).
One conclusion can be stated, however. Common principles of statutory interpretation fail to unsettle the apparent *42 application of § 241(a)(5) to any reentrant present in the country, whatever the date of return.[8]
B
This facial reading is confirmed by two features of IIRIRA, not previously discussed, that describe the conduct to which § 241(a)(5) applies, and show that the application suffers from no retroactivity in denying Fernandez-Vargas the opportunity for adjustment of status as the spouse of a citizen of the United States.[9] One is in the text of that provision itself, showing that it applies to Fernandez-Vargas today not because he reentered in 1982 or at any other par *43 ticular time, but because he chose to remain after the new statute became effective. The second is the provision setting IIRIRA’s effective date, § 309(a), 110 Stat. 3009-625, which shows that Fernandez-Vargas had an ample warning of the coming change in the law, but chose to remain until the old regime expired and § 241(a)(5) took its place.
As a preface to identifying the conduct by Fernandez-Vargas to which the reinstatement provision applies (the conduct that results in reinstating the old deportation order without the former opportunities to seek adjustment of status), a look at our holding in St. Cyr, 533 U. S. 289, is helpful. The alien, St. Cyr, was a lawful, permanent resident who made a plea agreement and pleaded guilty to an aggravated felony charge. Although the resulting conviction justified his deportation, when he entered his plea the law allowed him to seek a waiver of deportation at the discretion of the Attorney General. Between the plea and deportation proceedings, however, IIRIRA and another statute repealed the provision for that discretionary relief, converting deportation from a possibility to a certainty. Id., at 325. The question was whether Landgraf barred application of the new law eliminating discretionary relief, on the ground that applying it to a defendant who pleaded guilty before the enactment of the new law would attach a further burdensome consequence to his plea, amounting to “a new disability, in respect to transactions or considerations already past,” 533 U. S., at 321 (internal quotation marks omitted). The answer was that converting deportation from a likely possibility to a dead certainty would add such a burden, and application of the new law was accordingly barred. Id., at 325. In making this “commonsense, functional judgment,” Martin, supra, at 357, we emphasized that plea agreements “involve a quid pro quo between a criminal defendant and the government,” St. Cyr, 533 U. S., at 321, in which a waiver of “constitutional rights (including the right to a trial),” had been exchanged for a “perceived benefit,” id., at *44 322, which in practical terms was valued in light of the possible discretionary relief, a focus of expectation and reliance, id., at 323.
St. Cyr’s agreement for a quid pro quo and his plea were entirely past, and there was no question of undoing them, but the “transactio[n] or consideratio[n]” on which § 241(a)(5) turns is different.[10] While the law looks back to a past act in its application to “an alien [who] has reentered . . . illegally,” 8 U. S. C. § 1231(a)(5), the provision does not penalize an alien for the reentry (criminal and civil penalties do that); it establishes a process to remove him “under the prior order at any time after the reentry,” ibid. Thus, it is the conduct of remaining in the country after entry that is the predicate action; the statute applies to stop an indefinitely continuing violation that the alien himself could end at any time by voluntarily leaving the country. It is therefore the alien’s choice to continue his illegal presence, after illegal reentry and after the effective date of the new law, that subjects him to the new and less generous legal regime, not a past act that he is helpless to undo up to the moment the Government finds him out.
*45 That in itself is enough to explain that Fernandez-Vargas has no retroactivity claim based on a new disability consequent to a completed act, but in fact his position is weaker still. For Fernandez-Vargas could not only have chosen to end his continuing violation and his exposure to the less favorable law, he even had an ample warning that the new law could be applied to him and ample opportunity to avoid that very possibility by leaving the country and ending his violation in the period between enactment of § 241(a)(5) and its effective date. IIRIRA became law on September 30,1996, but it became effective and enforceable only on “the first day of the first month beginning more than 180 days after” IIRIRA’s enactment, that is, April 1, 1997. § 309(a), 110 Stat. 3009-625. Unlawful alien reentrants like Fernandez-Vargas thus had the advantage of a grace period between the unequivocal warning that a tougher removal regime lay ahead and actual imposition of the less opportune terms of the new law. In that stretch of six months, Fernandez-Vargas could have ended his illegal presence and potential exposure to the coming law by crossing back into Mexico.[11] *46 For that matter, he could have married the mother of his son and applied for adjustment of status during that period, in which case he would at least have had a claim (about which we express no opinion) that proven reliance on the old law should be honored by applying the presumption against retroactivity.[12]
Fernandez-Vargas did not, however, take advantage of the statutory warning, but augmented his past 15 years of unlawful presence by remaining in the country into the future subject to the new law, whose applicability thus turned not on the completed act of reentry, but on a failure to take timely action that would have avoided application of the new law altogether. To be sure, a choice to avoid the new law before its effective date or to end the continuing violation thereafter would have come at a high personal price, for Fernandez-Vargas would have had to leave a business and a family he had established during his illegal residence. But the branch of retroactivity law that concerns us here is meant to avoid new burdens imposed on completed acts, not all difficult choices occasioned by new law. What Fernandez-Vargas complains of is the application of new law to continuously illegal action within his control both before and after the new law took effect. He claims a right to continue illegal conduct indefinitely under the terms on which it began, an entitlement of legal stasis for those whose lawbreaking is continuous. But “[i]f every time a man relied on existing law in arranging his affairs, he were made secure against any change in legal rules, the whole body of our law would be ossified forever.” L. Fuller, The Morality of Law 60 (1964) (quoted in Landgraf, 511 U. S., at 270, n. 24).[13]
*47 Because we conclude that § 241(a)(5) has no retroactive effect when applied to aliens like Fernandez-Vargas, we affirm the judgment of the Court of Appeals.

It is so ordered.

 What was formerly known as “deportation” is now called “removal” in IIRIRA. See Neuman, Habeas Corpus, Executive Detention, and the Removal of Aliens, 98 Colum. L. Rev. 961, 966 (1998) (IIRIRA “realigned the vocabulary of immigration law, creating a new category of ‘removal’ proceedings that largely replaces what were formerly exclusion proceedings and deportation proceedings”). Our use of each term here will vary according to the scheme under discussion.

 This is the full text of the provision: “Should any alien subject to the provisions of subsection (c) unlawfully return to the United States after having been released for departure or deported pursuant to this section, the previous warrant of deportation against him shall be considered as reinstated from its original date of issuance.”

 A date was inserted when the provision was codified; as originally enacted, the text read, “whether before or after the date of enactment of this Act.” 66 Stat. 212.

 Notwithstanding the absolute terms in which the bar on relief is stated, even an alien subject to § 241(a)(5) may seek withholding of removal under 8 U. S. C. § 1231(b)(3)(A) (2000 ed.) (alien may not be removed to country if “the alien’s life or freedom would be threatened in that country because of the alien’s race, religion, nationality, membership in a particular social group, or political opinion”), or under 8 CFR §§ 241.8(e) and 208.31 (2006) (raising the possibility of asylum to aliens whose removal order has been reinstated under INA § 241(a)(5)).

 Two Courts of Appeals have held that § 241(a)(5) does not apply at all to aliens who reentered before the provision’s effective date, see Bejjani v. INS, 271 F. 3d 670 (CA6 2001); Castro-Cortez v. INS, 239 F. 3d 1037 (CA9 2001), while eight have held that it does, at least in some circum stances, see Arevalo v. Ashcroft, 344 F. 3d 1 (CA1 2003); Avila-Macias v. Ashcroft, 328 F. 3d 108 (CA3 2003); Velasquez-Gabriel v. Crocetti, 263 F. 3d 102 (CA4 2001); Ojeda-Terrazas v. Ashcroft, 290 F. 3d 292 (CA5 2002); Faiz-Mohammad v. Ashcroft, 395 F. 3d 799 (CA7 2005); Alvarez-Portillo v. Ashcroft, 280 F. 3d 858 (CA8 2002); 394 F. 3d 881 (CA10 2005) (case below); Sarmiento Cisneros v. United States Attorney General, 381 F. 3d 1277 (CA11 2004). The Courts of Appeals in the majority are themselves divided on the question whether an alien’s marriage or application for adjustment of status before the statute’s effective date (facts not in play here) renders the statute impermissibly retroactive when it is applied to the alien. See, e. g., Faiz-Mohammad, supra, at 809-810 (application for adjustment of status); Alvarez-Portillo, supra, at 862, 867 (marriage).

 The Government urges us to forgo Landgraf analysis altogether because § 241(a)(5) regulates only a present removal process, not past primary conduct, citing our recent decision in Republic of Austria v. Altmann, 541 U. S. 677 (2004). Although we ultimately agree with the Government, in the abstract at least, that the reinstatement provision concerns itself with postenactment affairs, see infra, at 44-46, we find the Government’s allusion to Altmann inapt. The Court’s conclusion in that ease, that Landgraf was to be avoided, turned on the peculiarities of the Foreign Sovereign Immunities Act. See Altmann, supra, at 694-696. Those peculiarities are absent here, and we thus advert to Landgraf, as we ordinarily do.

 We therefore need not entertain Fernandez-Vargas’s argument that the provision’s drafting history indicates that the language was eliminated deliberately.

 Justice Stevens states that when, in 1952, Congress inserted the before-or-after clause with the old § 242(f), it was responding to the Immigration and Naturalization Service (INS) practice of applying the reinstatement provision only to deportation orders issued after the provision’s enactment, a practice that necessarily meant the INS applied the provision only to postenaetment reentries. By correcting the INS’s interpretation only as to deportation orders, Justice Stevens suggests, Congress did nothing to disturb the practice as to reentries. And when it removed the obsolete before-or-after clause in 1996 without adding alternative language of temporal reach, the argument goes, Congress held fast to its intent in 1950 and 1952 to apply the reinstatement provision only to postenaetment reentries. But the INS’s practice circa 1951 of applying the reinstatement provision only to postenaetment reentries followed from its policy regarding deportation orders, and in 1952 Congress might just as easily have assumed that the branch would go the way of the root. In any event, it is difficult to accept Justice Stevens’s view that congressional understanding from 40 years back was intended to govern the IIRIRA reinstatement provision, given Congress’s care to make the revised criminal and civil penalties applicable only to postenaetment reentries.

 We would reach the same conclusion about denial of opportunities to apply for permission for voluntary departure as an alternative to removal, see 8 U. S. C. § 1229c, and about cancellation of removal, see § 1229b(b), if there were a need to deal with these matters separately. Although Fernandez-Vargas argues that he is being denied the chance to seek these forms of relief, he never applied for either of them and has not formally attempted to claim them in response to the reinstatement and removal proceedings.

 We understand Fernandez-Vargas’s claim as falling within the second of Justice Story’s categories of retroactivity (new consequences of past acts), not the first category of canceling vested rights. The forms of relief identified by Fernandez-Vargas as rendered unavailable to him by § 241(a)(5) include cancellation of removal, see 8 U. S. C. § 1229b(b), adjustment of status, see § 1255, and voluntary departure, see § 1229c. These putative claims to relief are not “vested rights,” a term that describes something more substantial than inchoate expectations and unrealized opportunities. In contrast to “an immediate fixed right of present or future enjoyment,” Pearsall v. Great Northern R. Co., 161 U. S. 646, 673 (1896) (internal quotation marks omitted), Fernandez-Vargas’s claim to such relief was contingent, and it was up to him to take some action that would elevate it above the level of hope. It is not that these forms of relief are discretionary, cf. St. Cyr, 533 U. S., at 325; it is rather that before IIRIRA’s effective date Fernandez-Vargas never availed himself of them or took action that enhanced their significance to him in particular, as St. Cyr did in making his quid pro quo agreement, see supra, at 43 and this page.

 In a series of letters submitted to the Court after oral argument, the parties dispute the consequences if Fernandez-Vargas had left voluntarily after IIRIRA’s enactment and, specifically, the period of inadmissibility to which Fernandez-Vargas would thereupon have been subject. Because we conclude that § 241(a)(5) does not operate on a completed preenactment act, we need not consider the retroactive implications either of the fact of his inadmissibility or of any variance between the period of inadmissibility upon a postenaetment voluntary return and that prescribed under the old regime. The period of inadmissibility stems from an alien’s illegal reentry within a specified time after a prior removal and is applicable to Fernandez-Vargas because he reentered shortly after his 1981 deportation, but Fernandez-Vargas does not challenge as impermissibly retroactive IIRIRA’s lengthening of that period from 5 to 10 or 20 years, see 8 U. S. C. § 1182(a)(6)(B) (1994 ed.); § 1182(a)(9)(A)(ii) (2000 ed.).
In any event, any period of inadmissibility is subject to waiver by the Attorney General, see § 1182(a)(6)(B) (1994 ed.); § 1182(a)(9)(A)(iii) (2000 ed.), and presumably Fernandez-Vargas could plead his serious ease for such a waiver (his marriage, his child) in seeking legal reentry to the United States.

 See 394 F. 3d, at 890, and n. 11 (distinguishing Fernandez-Vargas’s circumstance from that of aliens who had married, or both married and applied for adjustment of status, before IIRIRA’s effective date).

 This is the nub of our disagreement with Justice Stevens. He says it misses the point to say that Fernandez-Vargas could avoid the new law by returning to Mexico, which he thinks is like saying that a defendant *47 could avoid a retroactive criminal penalty by locking himself up for 10 years, post, at 48, n. 2. Justice Stevens thus argues that reimposing an order of removal to end illegal residence is like imposing a penalty for a completed act (the defendant’s unspecified act in his analogy). But even on his own analysis, Fernandez-Vargas continued to violate the law by remaining in this country day after day, and Justice Stevens does not deny that the United States was entitled to bring that continuing violation to an end. He says, however, that Congress should not be understood to provide that if the violation continues into the future it may be ended on terms less favorable than those at the beginning. But this is not the position that retroactivity doctrine imputes to an inexplicit Congress. Fernandez-Vargas may have an equitable argument that the Government should not, for the future, eliminate an opportunity for continuing illegality accompanied by the hopes that long illegal residence and a prospect of marriage gave him in the past. But Congress apparently did not accept such an argument, which could prevail here only if the presumption against retroactivity amounted to a presumption of legal stasis for the benefit of continuous lawbreakers.